**TECHSERVE ALLIANCE, f/k/a National Association Of Computer Consultant Business, Plaintiff,**

v.

**Janet NAPOLITANO, Secretary, U.S. Department of Homeland Security, et al., Defendants.**

**Civil Action No. 10–0353 (RCL).**

United States District Court, District of Columbia.

Aug. 17, 2011.

---

Laura Metcoff Klaus, Maggie Sklar, Robert P. Charrow, Greenberg Traurig, L.L.P., Washington, DC, for Plaintiff.

Michelle Lo, U.S. Attorney's Office, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

ROYCE C. LAMBERTH, Chief Judge.

## I. INTRODUCTION

Plaintiff Techserve Alliance, formerly known as the National Association of Computer Consultant Businesses ("NACCB") submitted a Freedom of Information Act ("FOIA") request to the United States Citizenship and Immigration Services ("US-

CIS") seeking H–1B visa materials. NACCB—an association of information technology staffing, solutions, and consulting firms—hires the recipients of H–1B visas, which allow temporary non-immigrant alien workers to gain employment in the United States. USCIS responded by reiterating the propriety of its search and subsequent decision to withhold numerous documents. NACCB filed suit against US-CIS, challenging the adequacy of its search and response to the FOIA request as well as USCIS's subsequent decision to withhold numerous documents. The case is now before the Court on the parties' cross-motions for summary judgment. Having reviewed the motions, the oppositions, the replies, the entire record in the case, and the applicable law at length, the Court grants defendants' motion for summary judgment for the reasons that follow.

## II. BACKGROUND

FOIA allows the public to gain access to records from a federal administrative agency, *Valencia–Lucena v. U.S. Coast Guard,* 180 F.3d 321, 325 (D.C.Cir.1999), and represents a strong Congressional commitment to transparency in government through the disclosure of govern-ment information. *Dep't of the Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). FOIA strikes a balance between "ensur[ing] an informed citizenry, vital to the functioning of a democratic society," and "legitimate governmental and private interests [that] could be harmed by [the] release of certain types of information." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871, 872 (D.C.Cir. 1992). Though FOIA embodies a policy of disclosure, full disclosure cannot always be achieved, and thus the Act sets forth nine exemptions that allow an agency to withhold all or parts of a document. 5 U.S.C. § 552(b)(1)-(9) (2006).

### A. Factual History

### 1. Scope of NACCB's FOIA Request

On April 15, 2009, Mark B. Roberts, CEO of NACCB, submitted a FOIA request to USCIS for materials relating to H–1B petitions and related policies. Def.'s Mot. Summ. J. 4, June 24, 2010, ECF No. 16 ("Def.'s Mot."). NACCB's request sought material related to nine categories of documents and did not request expedited processing.[1] United States employers

---

1. NACCB requested the following categories of documents:

1) Document entitled "H–1B Petitions, Fraud Referral Sheet;"

2) Policies, strategies, or priorities of US-CIS with respect to the processing of H–1B nonimmigrant petitions;

3) Revisions, modifications, edits, or other changes in Chapter 31.3 of the USCIS Adjudicator's Field Manual ("AFM") entitled "H–1B Classification and Documentary Requirements" or any predecessor manual;

4) Memorandum from Michael L. Aytes, Assistant Commissioner, INS Office of Adjudications, interpreting the term "itinerary" found in 8 C.F.R. § 214.2(h)(2)(i)(B) as it relates to the H–1B Nonimmigrant classification, HQ 70/6.2.8 (December 29, 1995), and any subsequent revisions, updates or modifications thereof;

5) Interoffice Memorandum, Donald Neufeld, Acting Associate Director, Domestic Operations, *Removal of the Standard Request for Evidence Processing Timeframe Final Rule,* 8 C.F.R. § 103.2(b); New Appendix 10–9 (AFM Update AD07–05), HQ 70/11, 70/12, AFM Update AD7–05, June 1, 2007, and any subsequent revisions, updates, or modifications thereof;

6) Memorandum from the INS Associate Commissioner for Examinations dated November 13, 1995, file HQ 21 4h-c., pertaining to USCIS requirements for H–1B visa petitioners;

7) Memorandum from William Yates, Associate Director, Operations, USCIS, dated February 16, 2005, entitled *Requests for Evidence*

seeking to hire temporary, highly skilled, non-immigrant alien workers must file and obtain H–1B visas for those potential employees. *Id.* The National Records Center ("NRC"), an office that processes FOIA requests submitted to USCIS, received NACCB's FOIA request on April 21, 2009. USCIS acknowledged receipt of NACCB's FOIA request on April 22, 2009, and assigned control number NRC2009022434 to it.[2] Decl. of Jill Eggleston 4, Ex. 1 to Def.'s Mot. Summ. J., June 24, 2010, ECF No. 16–1 ("Eggleston Decl.").

NRC handles FOIA requests pursuant to a "first-in/first-out system of processing," permitting USCIS to respond to relatively simple requests faster than those requests involving complex or voluminous records. *Id.* at 2. Jill Eggleston, the Assistant Center Director for NRC, explained that a complex FOIA request in 2009 required an average of twelve to eighteen months to process to completion. Supplemental Decl. of Jill Eggleston 2, Ex. 1 to Def.'s Reply Support Mot. Summ. J., Sept. 2, 2010, ECF No. 22 ("Supp. Eggleston"). When NRC received the

NACCB's FOIA request, it forwarded the request to its Significant Interest Team. *Id.* The Significant Interest Team subsequently assigned paralegal Cynthia Holt to handle NACCB's FOIA request.[3] *Id.;* Eggleston Decl. 2. Holt determined that three offices—the National Security and Records Verification Directorate ("NSRV"), the Service Center Operations ("SCOPS"), and the Office of Policy and Strategy ("OPS")—were most likely to have documents responsive to NACCB's request. Eggleston Decl. 5–6.

### 2. The Response to NACCB's FOIA Request

After receiving NACCB's FOIA request, NSRV determined that the Fraud Detection and National Security Office ("FDNS"), a division of USCIS, had responsive documents.[4] *Id.* at 2. When FDNS received NACCB's FOIA request, Charles Pratt—an Immigration Officer and resident expert for employment fraud within FDNS—discussed the request with his supervisors and contacted relevant offices within USCIS and FDNS.[5] *Id.* at 2.

---

*(RFE) and Notices of Intent to Deny (NOID);* and any subsequent revisions, updates, or modifications thereof; and

8) Communications to and from the Department of Labor ("DOL") concerning the processing of H–1B visa applications or Labor Condition Applications ("LCA") from January 2000 to present; and

9) Communications to and from the Department of State ("DOS") concerning the processing of H–1B visa applications and the issuance of H–1B visas from January 1, 2000 to present. Eggleston Decl. 4.

2. USCIS disseminates accurate and useful information regarding immigration issues in addition to granting immigration and citizenship benefits. Def.'s Mot. 3. Additionally, USCIS is the agency responsible for processing H–1B temporary visa petitions and works to ensure the integrity of the U.S. immigration system. *Id.*

3. The Significant Interest Team reviews incoming FOIA requests and determines their nature and scope. Eggleston Decl. 5. The paralegal assigned to the request identifies any and all Agency offices that might have potentially responsive documents and forwards the request to those offices. *Id.* The offices with responsive documents send the materials back to the NRC paralegal, who reviews the documents to determine whether any FOIA exemptions apply. *Id.* at 8.

4. NSRV, at the time of the FOIA request, ensured the security and integrity of the United States immigration system by handling specific functions within it. Eggleston Decl. 5.

5. The FDNS division of USCIS detects, investigates, apprehends, and deters immigration fraud in conjunction with agencies within the Department of Homeland Security ("DHS") and offices outside of it. Def.'s Mot. 1.

Pratt then searched FDNS's shared computer drive and his personal computer drive in addition to examining hard copy files for responsive records. *Id.* Pratt sent all responsive documents back to the NRC on or about May 12, 2009. Eggleston Decl. 6.

When SCOPS received NACCB's FOIA request, adjudications officer April Padilla contacted and subsequently forwarded the FOIA request to four Service Centers located within the Center Fraud Detection Operations because she believed those offices might have responsive records.[6] *Id.* at 3. Additionally, Padilla forwarded the request to Carol Williams—an adjudications officer who worked on H–1B matters—who searched the SCOPS headquarters for any records, including hard copy and electronic materials that might be responsive to the FOIA request. *Id.* A SCOPS employee also suggested that Holt contact USCIS's Office of Field Operations for materials responsive to NACCB's third category of documents, the Adjudicator's Field Manual ("AFM"). *Id.* Holt subsequently contacted Roger Pitcairn, the point person for all AFM requests, in relation to the FOIA request. *Id.* SCOPS forwarded all responsive documents to NRC on or about May 29, 2009. Eggleston Decl. 6.

When the FOIA request reached OPS, it determined that it did not have responsive materials.[7] *Id.* Additionally, OPS indicat-ed that the FOIA request fell outside its purview and suggested instead that NRC contact FDNS and SCOPS, as those offices were more likely to contain responsive materials. *Id.*

### 3. Processing NACCB's FOIA Request

On March 22, 2010, NACCB's request reached the front of the FOIA queue at the NRC. and Holt began to process the request.[8] Eggleston Decl. 7. After receiving and evaluating material amassed from various agencies and offices, Holt determined that 1,052 pages were responsive to the request. Def.'s Mot. 3. Holt assessed each page to establish: 1) whether a FOIA exemption precluded its disclosure; 2) whether parts of a document could be segregated, consistent with FOIA regulations; and 3) whether a document merited a direct response from a different agency.[9] *Id.*

Holt concluded that 286 pages could be fully released, and 71 pages could be released in part. *Id.* She completed a line-by-line review of each of the remaining 621 pages, concluding that they could not be disclosed or reasonably segregated. *Id.* at 3–4. Finally, Holt determined that 74 pages merited the direct response of the DHS Office of Inspector General ("OIG"). Def.'s Mot. 4. By a letter dated March 24, 2010, USCIS referred those 74 pages to OIG for a direct response. Eggleston Decl. 8. After concluding that OIG should

---

6. SCOPS—part of USCIS's Domestic Operations Directorate at the time of the FOIA request—ensured that immigration information and benefits were provided to domestic customers in a timely and accurate manner. Eggleston Decl. 5–6.

7. OPS, a headquarters program at USCIS, makes policy recommendations and performs policy research and analysis regarding immigration service issues in addition to coordinating immigration policy issues with DHS headquarters. Eggleston Decl. 5.

8. FOIA requests are handled in the order they are received and are placed into one of two tracks indicating whether the request is simple or complex. Eggleston Decl. 2. Complex requests involve collaboration across agencies and/or offices. *Id.*

9. Agencies commonly refer documents to another agency for a "direct response" if the receiving agency concludes that another agency should bear the responsibility of determining whether requested material is exempt under FOIA. 6 C.F.R. § 5.4(c)(1) (2010).

not directly respond to the request concerning these 74 pages, NRC directed FDNS to search for the document. *Id.* at 9. FDNS's search ultimately proved unsuccessful, and it directed NACCB—via a letter dated June 23, 2010—to a website where the final version of the document was publicly available, in addition to releasing six other pages that had been originally withheld. *Id.*

By a letter dated March 30, 2010, US-CIS disclosed 357 pages of responsive, non-exempt documents to NACCB. *Id.* at 4. USCIS withheld a number of documents pursuant to FOIA exemptions 2, 5, 6, and 7(e).[10],[11] Def.'s Mot. 5; USCIS Letter to Mark B. Roberts, Def.'s Mot. Summ. J. 26, ECF No. 16–1 (Incorporated as Exhibit D) ("USCIS Response"). USCIS included instructions detailing the procedure for an administrative appeal if NACCB did not agree with its assessment of the FOIA request. USCIS Response 2. USCIS also informed NACCB that it was unable to locate documents related to categories 8 and 9 of the request, but that it would continue to search for responsive records. Eggleston Decl. 8. USCIS advised NACCB that if new responsive records

were located, it would send them via a separate letter. *Id.*

On March 31, 2010, SCOPS located an additional set of records, responsive to category 8 of NACCB's request, which it sent to NRC for evaluation.[12] *Id.* at 6. Holt followed the same process laid out above, concluding that 48 pages were responsive to NACCB's request and that 42 pages merited a direct response from the Department of Labor ("DOL"). *Id.;* Eggleston Decl. 8. DOL determined that the 42 pages could be released. Eight of the 42 pages, however, contained redactions pursuant to FOIA Exemptions 5 and 7(e). Decl. Brian Pasternak 2, Exhibit 2 Def.'s Mot. Summ. J. June 24, 2010, ECF No. 16–2 ("Pasternak Decl.").[13] Holt subsequently evaluated the six remaining pages, concluding that two pages could be released in full while three pages could be released in part. *Id.* Holt only withheld one page, determining that the page could not be reasonably segregated. *Id.* The NRC released the non-exempt pages by a letter dated April 5, 2010.

### B. Procedural History

NACCB filed this lawsuit on March 4, 2010, alleging that USCIS failed to re-

---

10. The Court declines to address NACCB'S FOIA Exemption 2 argument, as defendant acknowledges that it will not withhold documents 14, 24, 28, 29, 30, and 32 in their entirety and portions of documents 25, 26, and 31 pursuant to the recent Supreme Court decision in *Milner v. Dep't of the Navy,* —— U.S. ——, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011) (holding that Exemption 2 does not shield material on the ground that its "disclosure would significantly risk circumvention of federal agency functions").

11. Additionally, the Court will not address NACCB's FOIA Exemption 6 argument because NACCB does not challenge the redactions of personnel information. Pl.'s Cross–Mot. Summ. J. 5, July 26, 2010, ECF No. 18 ("Pl.'s Cross–Mot.").

12. SCOPS informed NRC that it was unable to find responsive documents that corresponded to category 9 of NACCB's FOIA request. Eggleston Decl. 8. SCOPS also assigned a new control number— NRC2010019940—to the documents responsive to category 8 of the request. *Id.*

13. NACCB does not dispute DOL's findings in relation to the 42 pages that were directly referred to the agency. DOL released all 42 pages, making minor redactions on eight pages pursuant to Exemption 5 and withholding one page pursuant to Exemption 7(a). Decl. Brian Pasternak 1, Ex. 2 Def.'s Mot. Summ. J., June 24, 2010, ECF No. 16–2 ("Decl. Pasternak"). The Court finds that DOL properly redacted the nine pages in dispute pursuant to FOIA exemptions 5 and 7(a) respectively.

spond to its FOIA request submitted on April 15, 2009. USCIS subsequently moved for summary judgment on June 24, 2010. USCIS's motion for summary judgment centers around two arguments: 1) that it conducted a reasonable search for documents and disclosed documents that were not exempt under FOIA and 2) that it properly withheld documents pursuant to FOIA Exemptions 5 and 7(e). In response, NACCB cross-moved for summary judgment. Pl.'s Cross–Mot. 2. Having fully reviewed the record and the parties' evidence, the Court now turns to the merits of the motions.

## III. LEGAL STANDARD

Summary judgment should be granted when the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, ... admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a)-(c). This standard requires more than the mere existence of *some* factual dispute between the parties; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C.Cir.2006). "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for

the non-moving party." *Doe v. IRS*, 706 F.Supp.2d 1, 5 (D.D.C.2009) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

This Court reviews a motion for summary judgment arising from an agency's decision to withhold or disclose documents under FOIA *de novo*. *Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C.Cir.1977). The agency must demonstrate that it "conducted a search reasonably calculated to uncover all relevant documents" and that any withheld material falls within a statutory exemption. *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C.Cir.1983). The agency must prove that information was not withheld due to bad faith. *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981). FOIA exemptions must be "narrowly construed," *FBI v. Abramson*, 456 U.S. 615, 630, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982), and if records are improperly withheld, the Court may order their production. 5 U.S.C. § 552(a)(4)(B).

## IV. ANALYSIS

### A. Reasonableness and Adequacy of USCIS's Search

The adequacy of an agency's search is governed by principles of "reasonableness." *Oglesby v. U.S. Dept. of Army*, 920 F.2d 57, 68 (D.C.Cir.1990). NACCB contends that USCIS's search was unreasonable because 1) USCIS failed to timely respond to its request; 2) the search USCIS conducted was inadequate and unreasonable; and 3) USCIS failed to notify it of the use of a search cut-off date.[14] As

---

14. A search cut-off date refers to the date that an agency begins its search for responsive documents. Agencies typically do not wait until a document is "due for processing" to search for documents; rather, agencies use the date the search commenced, per agency policy. Supp. Eggleston 3. This practice ensures "that, to the maximum extent possible,

responsive documents are searched for, located, transmitted to the NRC and available to the NRC for processing when the request comes up the queue for processing." Supp. Eggleston 2. Following this policy, FDNS and SCOPS completed their searches for responsive material in April and May 2009, respectively. *Id.* at 3.

explained below, the timeliness of USCIS's response is irrelevant and its actual search was reasonable.

As an initial matter, although NACCB bemoans USCIS's search procedure (or lack thereof), USCIS's delayed response in searching for responsive materials will not affect this summary judgment motion. As this Court has previously noted:

> A lack of timeliness does not preclude summary judgment for an agency in a FOIA case. The only question for summary judgment is whether the agency finally conducted a reasonable search, and whether its withholdings are justified. When exactly a reasonable search was conducted is irrelevant. *See, e.g., Atkins v. DOJ* [1991 WL 185084] 1991 U.S.App. LEXIS 22309 (D.C.Cir. Sept. 18, 1991) (unpub.) ("The question whether DEA complied with the FOIA time limitations in responding to Aaron Atkins' request is moot because DEA has now responded to this motion.").

*Landmark Legal Found. v. E.P.A.*, 272 F.Supp.2d 59, 62 (D.D.C.2003). Thus, USCIS's delayed response to NACCB's request will not factor into the Court's decision regarding the adequacy and reasonableness of USCIS's search.

■■■ A court evaluating whether an agency conducted a reasonable search focuses its inquiry on "whether the search for those documents was adequate," and not on the possibility that other responsive documents exist. *Kidd v. Dep't of Justice*, 362 F.Supp.2d 291, 294 (D.C.Cir.2005). To prove that a requested document falls within a statutory exemption, an agency may submit "affidavits or declarations that describe the withheld material in reasonable detail and explain why it falls within the claimed FOIA exemptions." *Judicial*

*Watch v. United States Postal Serv.*, 297 F.Supp.2d 252, 256 (D.D.C.2004). Additionally, agencies may provide a *Vaughn* index—which is an itemized index correlating a FOIA exemption and the relevant nondisclosure justification to the withheld document—to prove that a claimed FOIA exemption applies to a certain document. *Carter, Fullerton & Hayes, LLC v. Fed. Trade Comm'n*, 637 F.Supp.2d 1, 5–6. The burden rests with the government to "establish their right to withhold information from the public and they must supply the courts with sufficient information to allow us to make a reasoned determination that they were correct." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C.Cir.1980).

■■ USCIS submitted a detailed *Vaughn* Index that explained the reasons for withholding fifty-three documents pursuant to several FOIA exemptions. Vaughn Index 1–32, Ex. A to Def.'s Mot. Summ. J., June 24, 2010, ECF No. 16–1 ("Vaughn Index"). As Eggleston explains in her declaration, employees searched their own personal records in addition to locating and identifying other agency offices that could have potentially responsive materials. Eggleston Decl. 5. NRC's search for responsive material unearthed 1,052 pages of responsive documents and, given that the standard for assessing the reasonableness of an agency's search does not hinge on the agency's ability to locate every responsive file, NACCB's arguments are unpersuasive. *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C.Cir.2004). Since the standard for assessing the reasonableness of a FOIA search is determined by assessing the search as a whole, NRC's inability to locate one document—when it conducted a supplemental search to find it—does not render its search efforts inadequate.[15]

---

**15.** NACCB disputes USCIS's withholding of documents numbered 1, 2, and 19, alleging

that these are publicly available documents. Pl.'s Cross–Mot. 10. Notwithstanding the fact

Eggleston Decl. 8; *see also Meeropol v. Meese,* 790 F.2d 942, 952–53 (D.C.Cir.1986) (clarifying that "it would be unreasonable to expect even the most exhaustive search to uncover every responsive file"). Considering the breadth of NACCB's FOIA request, USCIS conducted a good faith search for responsive documents that was reasonably calculated to uncover responsive documents.

When determining if the use of a search cut-off date was reasonable, this Circuit has held that an "agency bears the burden of establishing that any limitations on the search it undertakes in a particular case comport with its obligation to conduct a reasonably thorough investigation." *McGehee v. C.I.A.,* 697 F.2d 1095, 1101 (D.C.Cir.1983). While "conclud[ing] that neither the terms of the statute nor the case law interpreting them supports a claim that the use of a time-of-request cut-off date is always proper," the D.C. Circuit cautioned that courts should look to the facts of a case to evaluate the reasonableness of an agency's conduct. *In Defense of Animals v. Nat'l Insts. of Health,* 543 F.Supp.2d 83, 99 (D.D.C.2008) (quoting *McGehee,* 697 F.2d at 1102).

■ In this instance, USCIS failed to notify NACCB of its search cut-off policy. Indeed, nothing in USCIS's response to NACCB's FOIA request mentions a search cut-off date or the date USCIS used to process the request. USCIS Response 1–3. Furthermore, while USCIS argues that its acknowledgement letter directed NACCB's attention to 6 C.F.R. § 5, the letter only directed NACCB's attention to 6 C.F.R. § 5.3, which describes the payment process for FOIA requests. *Id.* at 2. For these reasons, NACCB argues that the court should require USCIS to supplement its search because NACCB "did not have notice as to the cut-off date, either by letter to . . . [NACCB] or by agency regulation." Pl.'s Cross–Mot. 13. The Court disagrees.

Although USCIS failed to specifically notify NACCB of its search cut-off date policy, the facts of this case support US-CIS's contention that it conducted an adequate search. As in *Defense of Animals,* USCIS searched for records shortly after receiving the FOIA request, but it delayed sending responsive material to NACCB for eleven months. 543 F.Supp.2d at 99. The Court in *Defense of Animals* explained that the defendants' explanation of their use of a search cut-off policy failed as they did not attempt "to sustain their burden of demonstrating the reasonableness of this cut-off date other than relying on unspecified agency policy." *Id.* Although USCIS also relies on agency policy for support, it conducted supplemental searches when it realized that its search did not include records pertaining to several categories of NACCB's request. Eggleston Decl. 8. Additionally, USCIS searched various agencies for missing materials and assigned a new control number to those documents. *Id.* Furthermore, USCIS did not use the date of the FOIA request as its search cut-off date, rather it used a later date, resulting in a "much fuller search and disclo-

that these documents were properly withheld in accordance with FOIA exemption 7(e), *see infra* IV C, they were never "officially released" by USCIS. A document is considered "officially released" when the information requested: 1) is as specific as the information previously released; 2) matches the information previously disclosed; and 3) is already public knowledge via an official and docu-

mented disclosure. *Afshar v. Dep't of State,* 702 F.2d 1125, 1133 (D.C.Cir.1983). Here, none of the specified documents meet this exacting standard, as there are "substantive differences" between the documents and previously disclosed information. Supp. Eggleston 3. Thus, NACCB's argument is unpersuasive.

sure" for NACCB. *McGehee,* 697 F.2d at 1104. · While in the future USCIS would be wise to expressly acknowledge the use of a search cut-off date policy in its response to FOIA requests, its failure to do so in this case does not render its search efforts unreasonable.

## B. Exemption 5

Under FOIA Exemption 5, the agency is not required to disclose documents that reveal "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Courts interpreting Exemption 5 have "construed this exemption to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context," including "materials which would be protected under the attorney-client privilege, the attorney-work privilege, or the executive 'deliberative process privilege.'" *Taxation with Representation Fund. v. Internal Revenue Serv.,* 646 F.2d 666, 676 (D.C.Cir.1981) (quoting *Carter, Fullerton, & Hayes, LLC v. Fed. Trade Comm'n,* 637 F.Supp.2d . 1, 10 (D.D.C.2009)). NACCB asserts that USCIS failed to disclose documents under FOIA Exemption 5 pursuant to the deliberative process privilege and the attorney-client privilege.

Agencies frequently rely upon the deliberative process privilege when invoking Exemption 5, a privilege that operates "to prevent injury to the quality of agency decisions." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 153, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). This privilege allows an agency to withhold "all papers which reflect the agency's group thinking in the process of working out its policy and determining which its law shall be." *Id.* The deliberative process privilege serves to assure that subordinates within an agency will feel free to provide the decision-maker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States,* 617 F.2d at 866. The following classes of documents are exempt under the deliberative process privilege: "1) federal official's notes, reports and other mental impressions, 2) work plans, status reports, briefings, opinion papers and proposals, 3) draft documents, 4) construction cost estimates, 5) attorney-client privilege, and 6) factual materials that were compiled for a specific pending procedure and an essential part of a specific policy-making process." *Hornbostel v. U.S. DOI,* 305 F.Supp.2d 21, 30–31 (D.D.C.2003).

An agency seeking to withhold or redact a document pursuant to the deliberative process privilege must prove that the withheld or redacted document is both pre-decisional and deliberative. *Mapother v. Dep't of Justice,* 3 F.3d 1533, 1537 (D.C.Cir.1993). A document is deemed pre-decisional "if it was prepared in order to assist an agency decision-maker in arriving at his decision, rather than to support a decision already made." *Judicial Watch, Inc. v. U.S. Dept. of Justice,* 306 F.Supp.2d 58, 69 (D.D.C.2004). A deliberative document must reflect "the give-and-take of the consultative process" and the inquiry "focuses on whether disclosure of the requested material would tend to discourage candid discussion within an agen-

cy." *Id.* As explained below, USCIS properly applied FOIA Exemption 5 to all of the disputed documents because the description of each document is sufficiently detailed for this Court to determine why the deliberative process privilege applies to the document.[16]

### 1. Applying the Pre–Decisional Standard to Draft Documents

As an initial matter, NACCB disputes the classification of several documents as "pre-decisional," arguing that USCIS failed to match the document with the corresponding final document. Pl.'s Cross–Mot. 17. An agency does not need to identify the policy or act that spurred the creation of a particular draft document. *See NLRB*, 421 U.S. at 151 n. 18, 95 S.Ct. 1504 (explaining that "agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process"); *see also Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 762 F.Supp.2d 123, 135–36 (D.D.C.2011) (holding that "even if an internal discussion does not lead to the adoption of a specific government policy, its protection under Exemption 5 is not foreclosed as long as the document was generated as part of the decision-making process").

NACCB specifically challenges the withholding of documents numbered 17, 21, and 22, which consist of e-mail exchanges between various agency officials regarding the possible implementation of changes to processing fraud matters involving H–1B visas. While these recommendations do not identify a specific agency decision, they reflect on-going discussions and debate regarding a change to current processing. If the Court were to order the release of this commentary, it would stymie the consultative process because employees might hesitate to express their opinions for fear of public disclosure. Since Exemption 5 expressly protects the deliberative process, USCIS properly withheld these documents in their entirety.

### 2. Draft Documents are Exempt under FOIA Exemption 5

This Circuit has held that "draft documents likely are to be protected under the deliberative process privilege because 'draft documents,' by their very nature, are typically pre-decisional and deliberative.'" *Radiation Sterilizers, Inc. v. U.S. Dep't of Energy*, 1991 U.S. Dist. LEXIS 4669, *10 (D.D.C. Apr. 9, 1991) (quoting *Exxon v. DOE*, 585 F.Supp. 690, 698 (D.D.C.1983)). Courts discourage disclosing rejected drafts since "such documents, if released, may actually mislead the public as to the policy of the agency." *Pies v. IRS*, 668 F.2d 1350, 1353 (D.C.Cir.1981). Mere classification of a document as a "draft document" does not end the inquiry; the government must also prove that the document is pre-decisional and related to the deliberative process. *Coastal States Gas*, 617 F.2d at 866.

The majority of the disputed documents are classified as "draft documents." The parties specifically dispute document number 15, which was prepared in 2007 and withheld in its entirety.

---

**16.** The parties dispute the applicability of the deliberative process privilege to documents numbered 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 17, 21, 22, and 23 as well as documents numbered 35, 37, 41, 42, 44, 46, 52, and 53 on the *Vaughn* Index. (The second list of documents corresponds to documents referred to the DOL for review.)

Vaughn 10. Document 15 is pre-decisional because it relates to a final agency decision, as it is a draft of the Office of the Inspector General's review of the Benefit Fraud Referral Process. *Id.* OIG did not release this document until April 2008, and the *Vaughn* Index indicates that the document contains pre-decisional commentary. *Id.* Document 15 was also a part of the deliberative process because it was modified prior to its final release in April 2008. *Id.* Releasing this document would provide the public with conflicting information, and thus USCIS properly withheld it in its entirety. For the same reasons, USCIS properly withheld draft documents numbered 5, 6, 7, and 8. Vaughn 3–6.[17]

### 3. Advisory Opinions Are Exempt Under FOIA Exemption 5

Documents that are specifically protected by the deliberative process privilege include "advisory opinions, recommendations and deliberations, comprising part of a process by which governmental decisions and policies are formulated." *NLRB*, 421 U.S. at 150, 95 S.Ct. 1504. Thus, documents that reflect personal opinions or provide advice cannot be disclosed under FOIA Exemption 5. *Exxon*, 585 F.Supp. at 698; *see also Mead*, 566 F.2d at 256 (explaining that even a discussion regarding implementation of a policy is exempt under FOIA Exemption 5).

 USCIS properly withheld documents 9–13, 23, 35, 37, 41, 42, 44, 46, 52, and 53 in their entirety pursuant to Exemption 5. Vaughn 6–9, 15, 23–31. Documents 9–12, which consist of "intra-agency" memoranda regarding H–1B Anti-Fraud Initiatives, are pre-decisional and

deliberative because they contain advisory opinions and seek guidance regarding process and policy changes that should be undertaken as a result of the BFCA report. *Id.* at 6–9. Similarly, documents 13 and 23 were withheld because they contained the opinions and recommendations of various agency officials regarding legal and policy matters related to the processing of H–1B visa petitions. *Id.* at 9, 15. The final seven documents contain e-mail communications between USCIS and DOL employees regarding the implementation of different policies at the agency. *Id.* at 23–31.

The Court declines to grant NACCB access to any of these documents because they are all pre-decisional and deliberative, qualifying for protection under the deliberative process privilege. Because all of these documents provided advisory opinions and recommendations, the release of which could hinder the deliberative process and confuse the public, this Court finds that USCIS properly withheld the documents in their entirety pursuant to FOIA Exemption 5.[18]

### C. Exemption 7(e)

Under FOIA Exemption 7(E), an agency is not required to disclose "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The D.C. Circuit has held that an agency may withhold information

---

17. Because the Court finds that document 7 is a draft document, it declines to address the applicability of the attorney-client privilege to this document.

18. Because this Court finds that document 12 is properly withheld pursuant to the deliberative process privilege, the Court declines to address the applicability of the attorney-client privilege.

from disclosure where releasing such information would provide insight into its investigatory or procedural techniques. *See Morley v. CIA*, 508 F.3d 1108, 1129 (D.C.Cir.2007); *see also Piper v. Dep't of Justice*, 294 F.Supp.2d 16, 30 (D.D.C.2003) (explaining that an agency could properly withhold polygraph test information because its disclosure "has the potential to allow a cunning criminal to extrapolate a pattern or method to the FBI's questioning technique").

NACCB disputes USCIS's withholding of documents related to "requests for evidence" in response to a benefits application or petition pursuant to FOIA Exemption 7(e).[19] This Court finds that USCIS properly withheld all of these documents. Since USCIS collaborates with other agencies within and outside of DHS to prevent immigration fraud, disclosing any of the aforementioned documents would reveal the selection criteria, fraud indicators, and investigative process that USCIS and other agencies use in fraud investigations during the H–1B visa process. Releasing this information would potentially enable the circumvention of law and could create national and homeland security problems, which Exemption 7(e) expressly prohibits. Thus, USCIS properly applied FOIA exemption 7(e) to the six documents in question.

## V. CONCLUSION

For these reasons, this Court grants defendants' motion for summary judgment and denies plaintiff's cross-motion for summary judgment.

A separate Order and Judgment memorializing this Opinion will issue this day.

DCFS USA, LLC, Plaintiff,

v.

**DISTRICT OF COLUMBIA,
et al., Defendants.**

**Civil Action No. 10–042 (RMC).**

United States District Court,
District of Columbia.

Aug. 17, 2011.

19. The documents in question are documents numbered 1, 2, 16, 18, 19, 20, and 27.

James Douglas Cuthbertson, LeClair-Ryan, Alexandria, VA, Jeena S. Patel, Michael G. Brady, Warner Norcross & Judd LLP, Southfield, MI, for Plaintiff.

Michael J. Lanzdorf, Tasha Monique Hardy, Office of the Attorney General, District of Columbia, Washington, DC, for Defendants.

## MEMORANDUM OPINION

ROSEMARY M. COLLYER, District Judge.

This is a case about a luxury car auctioned by the District of Columbia Department of Public Works ("DPW") without notice to the holder of the note. Plaintiff DCFS USA, LLC ("DCFS") sues the District of Columbia under the Fifth Amendment of the U.S. Constitution and 42 U.S.C. § 1983, complaining that the D.C. failed to provide constitutionally-required prior notice. Finding merit to the constitutional claim, the Court will enter summary judgment for DCFS on Count I of the Amended Complaint.

## I. FACTS

In 2006, Stephen Yelverton purchased a 2006 Mercedes Benz SLK350 (the "Vehicle") from Mercedes Benz of Alexandria in Alexandria, Virginia. Mr. Yelverton signed a purchase agreement, under which he gave a down payment of $8,000.00 towards the Vehicle's purchase price of $55,177.66, and agreed to sixty monthly payments of $706.17 beginning in September 2006, with a final payment of $23,106.30 due in September 2011. The total purchase price, with interest, was $65,476.50. The Vehicle operated with a Virginia license plate.

Mercedes Benz of Alexandria assigned the purchase agreement to DaimlerChrysler Financial Services Americas LLC ("DCFSA"), giving DCFSA a first security interest in the Vehicle. DCFSA's security interest was properly perfected and was reflected on the Vehicle's Certificate of Title. Plaintiff DCFS is the successor in interest to DCFSA and thus became the secured creditor to the Vehicle. Eventually, Mr. Yelverton defaulted on the purchase agreement by failing to make timely payments. DCFS notified Mr. Yelverton of his default and demanded payment in full, in the amount of $42,606.70, on September 16, 2008. Mr. Yelverton never cured the default.

On December 22, 2008, the DPW towed and impounded the Vehicle. On January 12, 2009, the DPW published an impoundment notice in The Washington Times, notifying the public of the DPW's intent to sell the Vehicle at auction. On February 4, 2009, the DPW sent an impoundment notice, by first class mail, to Mr. Yelverton at his last known address. Mr. Yelverton did not respond to the notice. The Vehicle was advertised for online auction between March 12 and March 19, 2009, and was sold on March 17, 2009, for $18,900. As of that date, it remained unclaimed. The DPW sold the Vehicle free and clear of DCFS's security interest.

The District of Columbia provided neither DCFSA nor DCFS with prior mailed notice that the Vehicle was impounded and might be auctioned. In July 2009, DCFS learned that the Vehicle had been auctioned by DPW after conducting an internet search using the Vehicle's vehicle identification number. An employee of DPW then informed DCFS that it had not received notice because the Vehicle was not registered in the District. Pl.'s Cross–

Mot. for Summ. J. & Opp'n to Def.'s Mot. for Summ. J. [Dkts. #31, 32] ("Pl.'s Opp'n"), Ex. I (Aff. of Ernie Bucks) ¶8. At the time the Vehicle was sold, Mr. Yelverton owed DCFS more than $42,000. DCFS demanded that the District reimburse it for the full amount, but the District rejected the demand. This lawsuit followed.

DCFS alleges that the District denied it prior notice and a meaningful opportunity to be heard on the impoundment and sale of the Vehicle in violation of its right to procedural due process under the Fifth Amendment of the United States Constitution (Count I) and also alleges a violation of 42 U.S.C. § 1983 (Count II). *See* Am. Compl. [Dkt. #27] Counts I–II. The Court ordered discovery solely on Count I, the Fifth Amendment claim, as the § 1983 claim would rise or fall with the first count. DCFS filed an Amended Complaint on November 19, 2010, omitting claims against Mr. Yelverton after he was voluntarily dismissed. *See* Am. Compl.; Notice of Voluntary Dismissal [Dkt. #8]. The District filed an amended motion to dismiss, or in the alternative, for summary judgment and DCFS cross-moved for summary judgment. The cross motions are ripe.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. FED.R.CIV.P. 12(b)(6). Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* 8(a)(1). A complaint must be sufficient "to give a defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d

929 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, the facts alleged "must be enough to raise a right to relief above the speculative level." *Id.* In deciding a motion under Rule 12(b)(6), a court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Id.*

Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* FED. R.CIV.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Waterhouse v. Dist. of Columbia,* 298 F.3d 989, 991 (D.C.Cir. 2002). In determining whether a genuine issue of material fact exists, the court must view all facts and draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. ANALYSIS

### A. Admissibility of Certain Evidence

The District of Columbia seeks to have the Court consider an affidavit by Cynthia Jones, a Certified Public Manager for

DPW's Abandoned Vehicle Division which states:

1. On December 23, 2008, the District inquired of the Maryland, Virginia, Pennsylvania and Delaware motor vehicle departments for information related to the ownership of the Vehicle, using its Virginia license plate number. These inquiries were made electronically, using the Washington Area Law Enforcement System ("WALES"), a computerized information system. The WALES system is the primary tool available to DPW to obtain ownership information for vehicles in its possession. All four departments reported that the license plate number was not registered in their jurisdiction.

2. On February 4, 2009, the District again inquired of the Virginia Department of Motor Vehicles ("DMV") for information about the Vehicle, this time providing its vehicle identification number. The Virginia DMV, using the National Law Enforcement Telecommunications System, responded with the name and address of Mr. Yelverton. No additional information was provided.

*See* Def.'s Reply & Opp'n to Pl.'s Cross–Mot. for Summ. J. [Dkts. # 34, 35] ("Def.'s Reply"), Ex. A (Affidavit of Cynthia Jones) ("Jones Aff.") ¶¶ 4, 7. The District introduced the Jones Affidavit, and the facts stated therein, for the first time in its combined reply and opposition to DCFS's cross-motion for summary judgment.

DCFS strongly objects to the District's attempt to undermine its previous admission in discovery that D.C. did not search the database of Virginia's DMV to determine whether there were any lienholders reflected on the Vehicle's title. *See* Pl.'s Reply [Dkt. # 36] at 5–6. The District admitted—and the Court judicially established as fact—that it "did not search the records of Virginia's Department of Motor Vehicles to determine whether there were any lien holders reflected on the title of the Vehicle." Pl.'s Opp'n, Ex. G (District's Responses to Admission Requests) ¶ 5.[1]

---

1. Although the District expressly admitted this fact (in its untimely response to DCFS's Requests for Admissions), the Court deemed admitted all of DCFS's Requests for Admissions because the District failed to respond timely. The District had moved for an extension of time to respond to the Requests after the deadline for doing so had passed, and for an extension of time to conduct discovery. *See* Def.'s Mot. for Order [Dkt. # 16]. While the Court granted more time to conduct discovery, the Court deemed the Requests admitted per Federal Rule of Civil Procedure 36(a)(3). *See* Order [Dkt. # 18]. The Court explained:

> On June 9, 2010, Plaintiff served its first set of written discovery requests upon the District, which included six Requests for Admissions. The District failed to timely respond to the written discovery requests. On July 16, 2010, Plaintiff filed a notice of deemed admissions pursuant to Federal Rule of Civil Procedure 36(a)(3). *See* Dkt. # 1[5]. Later the same day, the District moved to amend the Scheduling Order.

> *See* Dkt. # 16. The District [sought] leave to respond to the Plaintiff's written discovery requests by August 6, 2010, and request[ed] that discovery [already once extended, at its request] be extended until September 13, 2010. Plaintiff filed a timely opposition, but the District did not file a reply.

> While the Court is sympathetic to counsel's workload, it appears that the District "woke up" to this case only when the notice of deemed admissions was filed and then promptly went back to ignoring it, filing no reply to the Plaintiff's cogent opposition. This is not the proper basis for excusable neglect. The admissions are deemed admitted. The Court will not "unring" that bell. Other discovery is extended until September 13, 2010.

*See* Order [Dkt. # 18]. The District moved for reconsideration, *see* Def.'s Mot. for Reconsideration [Dkt. # 19], and argued in its reply that it had mistakenly, but in good faith, miscalculated the deadline for filing a reply in

Nonetheless, the District incredibly argues now that its admission before is not inconsistent with the Jones Affidavit that "[o]n December 23, 2008, inquiries were sent by the DPW to ... the Virginia Department of Motor Vehicles ... for information related to the ownership" and lienholder information of the Vehicle. Jones Aff. ¶ 4, *see also id.* ¶ 7 (further explaining that "an additional inquiry identifying the Vehicle by its Vehicle Identification Number was sent by the DPW to the Virginia Department of Motor Vehicles through WALES for information about the Vehicle"). The District contends that it employed WALES to conduct the inquiry, but did not search Virginia's DMV database itself. *See* Def.'s Surreply [Dkt. # 40] at 3 ("WALES does not allow the District to search the Virginia Department of Motor Vehicles' records; rather, WALES simply allows the District to request information concerning vehicles in its possession about which other states may have information."). In other words, the District used WALES as an intermediary to inquire of the Virginia DMV database as to information concerning the Vehicle, its previous admission and the Court's sanction to the contrary. The Court will not permit such gamesmanship. The District cannot undermine this binding and "conclusively established" fact through introduction of the Jones Affidavit. *See* FED.R.CIV.P. 36(b); *Rainbolt v. Johnson,* 669 F.2d 767, 768–69 (D.C.Cir.1981).

■ DCFS further moves to preclude the Jones Affidavit as a sanction under Rule 37 because of the District's failure to provide DCFS with information about the District's search of the databases of the four states during the course of discovery. *See* Pl.'s Reply at 7–9. "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED.R.CIV.P. 37(c)(1). A primary consideration for a court is that any Rule 37 sanction must be just. *See Bonds v. Dist. of Columbia,* 93 F.3d 801, 808 (D.C.Cir.1996). "The choice of sanction should be guided by the 'concept of proportionality' between offense and sanction." *Id.* (quoting *Shea v. Donohoe Constr. Co.,* 795 F.2d 1071, 1077 (D.C.Cir.1986)).

In response to DCFS's interrogatory requesting that the District "[d]escribe in detail the method by which the District determined when, where, how and to whom to provide notice of the impoundment of the Vehicle," and to identify all related documents, the District merely provided a list of documents and gave no recitation of the details contained in the Jones Affidavit. *See* Pl.'s Reply, Ex. B (District's Interrog. Responses) ¶ 5; *see also id.,* Ex. C (District's Supplemental Interrog. Responses) ¶ 5. A party must respond to an interrogatory, not by simply citing to a document, but by answering each question separately and fully in writing. *See* FED.R.CIV.P. 33(b)(1); *see also Equal Rights Ctr. v. Post Props., Inc.,* 246 F.R.D. 29, 34 (D.D.C.2007). Similarly, in response to an interrogatory that asked for the name, address and phone number of "each individual likely to have discoverable information" and to "describe in detail his or her specific material knowledge or information," the District identified Ms.

support of its original motion for an enlargement of time. *See* Reply in Support of Def.'s Mot. for Reconsideration [Dkt. # 21] at 1. The Court denied the motion for reconsideration. *See* Minute Entry Order 9/9/2010. Of course,

the District also expressly admitted it did not search Virginia's DMV records, so its current predicament does not rest solely on the Court's previous sanction.